THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD ROBERTSON, Defendant-Appellant.

Second District   No. 2—88—0874

Opinion filed June 5, 1990.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Richard L. Salon, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Donald Robertson, was convicted of robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—1) following a bench trial. He was sentenced to seven years' imprisonment with credit for time served. He appeals, contending that the State failed to prove his guilt of the charged offense beyond a reasonable doubt because of the unreliability of the testimony of the single identification witness. Defendant also contends that the State committed prejudicial errors in its numerous failed attempts to impeach defendant's alibi witnesses. In view of the State's repeated failure to perfect its impeachment of several defense witnesses, we reverse the conviction and remand the cause for a new trial.

The following facts were adduced at the bench trial on March 23, 1988. The complaining witness, Selma Dodson (Dodson), testified that on December 30, 1987, she was employed at a Checker gas station located at 619 North York Road in Elmhurst, Illinois. At approximately 8:20 p.m. two men walked in and asked for a water bucket. Dodson gave the men a bucket and told them they could fill it outside. The men left the station for a while and then returned. The first man walked behind the counter, and the second man, whom Dodson identified in court as defendant, stood in front of the cash register area. The first man told Dodson that they were going to rob her and instructed her to open the cash drawer and stand back. The second man placed his hand in his coat pocket and said that, as long as Dodson cooperated, nobody would be hurt. Dodson opened the drawer, and the men took a sum of cash, later determined to be $99.

After Dodson had surrendered the money, the robbers told her to go into a back room, and she complied. When she heard the robbers leave, Dodson emerged from the back room and ran outside the station, where she encountered a customer. She told the customer that she had been robbed and asked whether he had seen the men or their license plate number. She saw the robbers' car driving away from the station and making a right-hand turn. She described the vehicle as dark colored, possibly black or dark blue, and said that the car had two or three individual taillights on either side of the rear end mounted above the place for the license plate. She did not see a license plate and could not identify the make or model of the car.

Dodson said that police officers arrived within minutes of the robbery, and she assisted them in preparing composite sketches of the two offenders. She identified the two sketches in court. She said that the police officer preparing the sketch of the second robber asked her

specifically whether the second robber had a mustache, and she told the officer that he did not. Dodson's further description to the police specified that the second robber had long, black, greasy hair, a fair complexion, and a medium to slender build. She told the officer that the second robber wore a blue nylon jacket and blue jeans and spoke with a southern accent. She described the first robber as having sandy brown hair, a full and scraggly mustache, and wearing a tan knit cap and a green nylon arctic parka with a hood. Both sketches of the two offenders described their vehicle as a 1976 or 1977 Chevrolet Malibu which was dark or possibly black in color.

Testifying for defendant, Michael Cushing stated that he went to the Checker gas station for a pack of cigarettes on the night in question. As he approached the station, he saw two men leave and get into a car. Then the girl in the gas station came running out and told Cushing that she had just been robbed. Cushing said that he was bewildered and spun around to look at the men's car. He described the car as a very dark blue or black Chevrolet Chevelle or Malibu. He thought the car had an Illinois license plate but could not make out the number. He said the car lights were not on, but he described the rear end of the car as resembling a Chevrolet Malibu because of its sloping back end and the round body contour as well as the thin taillight which ran across the rear of the car.

Cushing testified that he was a route salesman for an auto parts company. He stated that he works on cars and restores them in the evenings and has done so for approximately 13 years. He also stated that he used to own a 1975 Chevelle. On cross-examination, Cushing admitted that he was completely unable to identify the men but was certain of his description and identification of the make and model of the car.

Officer Paul Carney of the Elmhurst police department testified that at about 3:15 a.m. or 3:50 a.m. on December 31, 1987, he was on a routine patrol in the area of York Road and Crestview in Elmhurst. He saw a dark car proceeding at a slow pace right in front of the Checker station. The car continued eastbound onto a side street and then pulled into a private driveway at 567 Indiana, where it remained for several minutes. Carney approached the car and observed four occupants, three men and one woman. The driver exited and Carney spoke with him. Carney identified defendant as the driver.

Carney testified that he inquired as to the occupants' activities, and the driver responded that his passenger thought he knew a girl who lived at that residence. Carney asked the driver for identification, and the driver said he had none; however, the driver stated his

name was Clifford Robertson and provided Carney with a birth date. Carney returned to his squad car to call in the driver's name and birth date. While he was waiting for a radio response, he noticed that the driver bore a resemblance to an "identisketch" of a robbery suspect he had picked up when he had gone on shift earlier in the evening. Carney returned to the car and told the driver he was under arrest for having a suspended driver's license and informed the driver that he would be questioned in connection with a robbery. Carney identified a photograph of the driver's car which depicts a blue 1976 Dodge Dart with no license plate.

Gary Fuller, another Elmhurst police officer, testified that he performed an inventory of the Dodge Dart at police headquarters. He found a brown wallet under the front seat on the passenger side of the car containing $350 in currency and no identification. Fuller stated that the car and the wallet, including its contents, were returned to their owner, Ed Schroader. Fuller also testified that the car contained numerous items of clothing, two overnight bags, toys and an army helmet. He did not see any blue or green nylon parkas in the car.

Michael Lullo, a third Elmhurst police officer, questioned defendant at around 5 a.m. at the police station. Lullo advised defendant that he was a suspect in a robbery. Defendant denied having committed a robbery and told Lullo that he had been in his parents' home in Carpentersville between 3 p.m. and midnight with his parents and others. Defendant said that he went to Elgin at midnight to pick up his cousin, Charles Schroader. Defendant told Lullo that Schroader lives in Addison. He also stated that he and his cousin were attempting to get on an expressway to head to Kentucky when they got lost in Elmhurst. Defendant initially told Lullo that he had pulled into the driveway on Indiana because he thought he knew a girl at the residence. He later told Lullo that the reason he had pulled into the driveway was because he did not have a driver's license and wanted to avoid Officer Carney.

Charles Schroader testified for defendant. He stated that he went by the name of Ed or Eddie and he is defendant's cousin. He said that he was employed in Elgin on December 30, 1987, and that he owned a 1976 Dodge Dart. He testified that his car did not yet have license plates but did have a registration sticker. Schroader said that defendant had dropped him off at work that day and later picked him up at approximately 1:10 a.m. Schroader, defendant and a friend went to Schroader's apartment in Addison where they picked up Schroader's personal belongings and his wife Janet. They then left for

Kentucky.

At the time of defendant's arrest, defendant had been driving Schroader's car, and Schroader had been riding in the front passenger seat. At this time, the police asked Schroader for identification, which he supplied from his wallet. His wallet, which contained $350 cash, remained in the car at the time the police towed the car away. Schroader stated that he had been paid the day before defendant's arrest and the $350 were the proceeds from his pay. The police later returned to Schroader his wallet and money.

Sometime after defendant's arrest, Selma Dodson went to the Elmhurst police station to view a lineup in connection with the robbery. While waiting at the station, she saw defendant and another man, both in handcuffs, in the custody of Elmhurst police officers. Dodson testified, "I figured I shouldn't see that, so, I went straight to the rest room, and started wondering, you know." Approximately one hour later, Dodson identified defendant as the second robber from the December 30 robbery.

At trial, Dodson described the second robber as about 5 feet 8 inches tall, wearing a blue parka, jeans and gloves. She stated that he had longer, blackish, greasy hair and a light mustache. She identified defendant in court as this individual. She testified that she had not told the police about defendant's mustache because it must have slipped her mind. She admitted that seeing defendant prior to the lineup made her more cautious in her identification at the lineup because:

> "I knew I shouldn't have seen these guys before and it made me start to wonder if I am picking him out because I saw him with the police officers or if I was picking them [sic] out because he was the one, and in my opinion, I picked him out because he is the one because the second individual that was with him [in the police station lobby area], there was no way he was involved in it."

Dodson stated that she was certain that defendant was involved in the robbery.

Defendant's mother, Anna Robertson, testified that she lives in Carpentersville, Illinois, with her husband, three foster children, defendant, and defendant's son. She stated that she saw defendant at 3:30 p.m and again at 7 p.m. on December 30, 1987. That evening, various family members, including defendant and his friend, Dave Halbert, were watching a movie about a white supremacy group on HBO entitled "Into the Homeland." Mrs. Robertson said that the movie began at 7 and ended at 9 p.m. She testified that shortly after

the movie began, defendant left the house to go to a nearby store. He was gone for 10 to 15 minutes. Defendant returned and left again to go to a nearby McDonald's restaurant.

Mrs. Robertson also stated that defendant left the house at approximately 8:15 to visit a neighbor and was gone for 15 to 20 minutes. After the movie was over, the family discussed the movie for a time, and defendant said he would lie down to rest before he left for Kentucky. Mrs. Robertson said that defendant left at 11:17 p.m.

On cross-examination, Mrs. Robertson denied telling an investigator that defendant had left at 11:15 p.m. She also denied telling the investigator that defendant was gone between 8 and 9 p.m to go to a liquor store. She denied telling the investigator that defendant went out to McDonald's a second time. Further, she did not confirm that she had told the investigator that her son was a white supremacist thinker and had been aware of the organization depicted in the movie prior to having seen the movie.

John Richter testified that he lives three doors away from the Robertsons in Carpentersville, Illinois. He testified that he and defendant were friends and defendant stopped by his home at approximately 8:15 on December 30, 1987, and stayed for 25 minutes. On cross-examination, Richter testified that he was watching the 8 o'clock movie on channel seven but could not recall the movie's title. The prosecutor suggested the title "Into the Homeland," and Richter agreed. On redirect examination, Richter admitted he was not positive of the name of the movie.

Defendant took the stand and testified that he lives in Carpentersville with his parents and his son. On December 30, 1987, he borrowed his cousin's car. That day, he took Schroader to work in Elgin and returned to Carpentersville at about 3:30 p.m. That evening, while at home, he watched a television movie entitled "Into the Homeland" with Dave Halbert. The movie began at 7 p.m. and was about a white supremacy group. He did not find the movie interesting and left the house to get some beer. After returning, he left again to go to a McDonald's restaurant. Still later, he left the house to visit John Richter, a neighbor. At approximately 11:30 p.m., defendant and Dave Halbert left the house to buy another case of beer and to pick up Schroader at work in Elgin. They arrived at Schroader's place of employment at about midnight.

Defendant testified that he was familiar with the area of Addison, Illinois, where Schroader lived. However, at the time he encountered the police, he was lost and had been trying to find the expressway to go to Kentucky. Defendant further stated that when the police officer

approached him at approximately 3 a.m., he gave the officer his brother's name because he himself did not have a driver's license. He was unaware at the time that his brother's license had been suspended.

On cross-examination, the following exchange took place between the defendant and the prosecutor:

"Q. Did you spend the night at Charles Schroader's apartment on December 29th, yes or no?

A. Yes.

Q. And if Schroader were to come into court and say that you didn't spend the night and that you arrived at his apartment at 12:00 o'clock on December 30th, would that be a lie on the part of Mr. Schroader, yes or no?

A. I wouldn't say it is a lie. I would say—well, I would say ask him."

In rebuttal, the State called Schroader, who testified that he believed defendant had spent the night at his apartment on December 29.

The evidence closed with the admission of certified copies of defendant's convictions of burglary, theft and obstructing justice. Both sides presented closing argument. In rebuttal argument by the State, the prosecutor discounted the credibility and reliability of defendant's alibi witnesses due to alleged inconsistencies and contradictions in their testimony. With regard to Mrs. Robertson, the prosecutor argued, "there were inconsistencies in her testimony. There were certain things that she said today that when she spoke with the investigator ***, she did not tell him."

The trial court found defendant guilty, stating specifically that defendant's alibi witnesses were lacking in credibility and "[t]heir factual basis is not consistent." The court also noted that Dodson, the single witness able to identify defendant, had had a good opportunity to observe the robbers at the time of the crime; and she had subsequently identified defendant at a lineup and in open court.

Defendant filed a timely motion for a new trial in which he alleged, *inter alia*, that Dodson's original identification of defendant was tainted because she saw defendant in police custody prior to identifying him in the lineup. Defendant also alleged that his alibi witnesses were unimpeached and unrebutted and that the trial court had erred in allowing the State to question defendant's witnesses impeaching questions and then failing to perfect the attempted impeachments. The court heard both sides' arguments and ultimately denied defendant's motion for a new trial. The trial court later sentenced defendant to seven years' imprisonment with credit for time served.

Defendant raises two issues on appeal: (1) whether the defendant was proved guilty beyond a reasonable doubt, and (2) whether the defendant was denied a fair trial by improper impeachment of defense witnesses.

As to the first issue, the defendant argues that Selma Dodson's identification of the defendant is untrustworthy and must be discounted. Dodson testified that she told police the defendant had long, black, greasy hair and no mustache. Defendant argues the photograph of him admitted at the hearing on defendant's post-trial motion shows that he had a prominent mustache and also reveals that his hair is not black or greasy.

Dodson also described her assailants as wearing parkas, jackets equipped with a "fuzzy" hood. The defendant allegedly wore a blue parka. Upon the defendant's arrest, however, police did not find such a coat.

Dodson described defendant's car as dark colored. However, the car defendant was driving at the time of his arrest was bright blue. That car was identified as a 1976 four-door Dodge. An after-occurrence eyewitness identified the getaway car as a 1975-77 Chevrolet dark blue or black.

Defendant contrasts the uncertainty of the above proofs with the testimony of his mother and Dave Richter, that at the time of the robbery defendant was in or near his Carpentersville home. He argues that because of this he was not proved guilty beyond a reasonable doubt of robbery.

The People point out that the testimony of Selma Dodson, that she had an adequate opportunity to observe the robber and her in-court identification of the defendant as that man, was positive, credible and reliable.

The People argue that the slight variance as to defendant's actual appearance does not require reversal of defendant's conviction, nor does the slight discrepancy in the identification of the motor vehicle require reversal.

■ In all criminal prosecutions the due process clause requires that the State has the burden of proving the defendant's guilt beyond a reasonable doubt. *In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072-73.

■ In weighing the sufficiency of the evidence in a criminal case, the finding of the trier of fact will be affirmed unless the court of review can form a reasonable and well-founded doubt as to the defendant's guilt. *People v. Smith* (1977), 52 Ill. App. 3d 583, 587.

■ It is settled that a single positive and credible witness, who

had an ample opportunity to observe the accused, is sufficient to support a conviction even though such testimony is contradicted by the alibi testimony of the accused. *People v. Jones* (1975), 60 Ill. 2d 300; *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 1016.

In this case, the trial court was faced with two conflicting versions of the incident. The State's witness identified the defendant as the robber and placed him at the scene of the crime. The defendant offered evidence of an alibi. The trial court was required to decide which of the two versions was entitled to greater credibility. The trial court concluded that the People's evidence proved the defendant guilty beyond a reasonable doubt. We cannot say the trial court was in error. *People v. Beasley* (1977), 54 Ill. App. 3d 109.

Next, the defendant contends he was denied a fair trial by improper impeachment of defense witnesses. He contends that the cross-examination of the defendant and defense witnesses was characterized by repeated questions suggesting inconsistent utterances, misconduct and racism. He suggests that since the cross-examination was not perfected or was irrelevant, the defendant was denied a fair trial.

The trial court rejected defendant's alibi evidence because it found that his witnesses were lacking in credibility and their testimony was not consistent. We determine that the prosecution's improper impeachment technique materially contributed to these findings. There is no question that the State erred repeatedly in its attempts to impeach defendant's witnesses. In *People v. Olinger* (1986), 112 Ill. 2d 324, 341, our supreme court stated, "[i]t is improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information." In the instant matter, the prosecutor insinuated that Mrs. Robertson had made several statements to an investigator which she either denied or could not recall. The State never offered the testimony of the investigator or his report to complete its impeachment of this witness. The State similarly failed to impeach defendant concerning his whereabouts on December 29, 1987, and failed to impeach Schroader on several points. Additionally, the State attempted to impeach Schroader by eliciting testimony concerning his prior arrests. It is well established that a judgment of conviction may be used for impeachment purposes but evidence of arrests, indictments, or the actual commission of crimes may not be used. *People v. Charleston* (1985), 132 Ill. App. 3d 769, 775.

Admittedly, the trier of fact is obliged to determine the credibility of a defendant's alibi witnesses (*People v. Slim* (1989), 127 Ill. 2d 302,

315), and, generally speaking, a trial judge is presumed to disregard incompetent evidence. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 394-95.) Our supreme court has observed that a trial judge's presumed immunity to improper or prejudicial evidence and insinuations does in fact have its limits. (*Nuccio*, 43 Ill. 2d at 396.) We believe the limits were reached in this case.

■■ In stating its finding of defendant's guilt, the instant trial court relied, apparently wholly, upon the credibility of the witnesses. The judge commented, while considering defendant's motion for a new trial: "I indicated, over and over again, the issue really boils down to the creditibility [*sic*] of the witnesses." Thus, we conclude that the State's repeated use of unsupported insinuations of conflicts in the testimony of defendant's witnesses seriously damaged their credibility. Further, the record does not demonstrate that the trial court was aware of the numerous improprieties, even though defendant presented them in his motion for a new trial. (See *Nuccio*, 43 Ill. 2d at 396.) Under these circumstances, we cannot conclude that defendant was given a fair trial.

For the reasons stated above, we reverse defendant's conviction and remand the cause for a new trial.

Reversed and remanded.

REINHARD and McLAREN, JJ., concur.