2019 IL App (1st) 160705
No. 1-16-0705
Opinion filed March 29, 2019

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | No. 12 CR 16111 |
| v. | ) ) | |
| COURTNEY LEWIS, | ) ) | The Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Courtney Lewis was convicted after a jury trial of aggravated

unlawful use of a weapon (AUUW) and sentenced to one year in the Illinois

Department of Corrections (IDOC).  On appeal, defendant claims:  that the

State failed to perfect its impeachment of defense witnesses; that the trial court

abused its discretion by denying defense counsel's request to have the gun

tested for fingerprints; and that the fines and fees order must be corrected. The State agrees that certain fines and fees must be corrected. For the following reasons, we affirm defendant's conviction and order the correction of certain fines and fees.

¶ 2                                    BACKGROUND

¶ 3            The trial court declared a mistrial after defendant's first trial due to a hung jury. Prior to his second trial, defendant moved the court to permit fingerprint testing of the gun in question. The trial court denied the motion, observing that the handling of the gun during the first trial would have obliterated any fingerprints on it and "the time to test this weapon for prints has come and gone."

¶ 4            At the second trial, the State called three police officers to testify, and the defense called defendant and a friend of defendant's. The trial was basically a credibility dispute between two competing versions of the events: the officers versus defendant and his friend.

¶ 5            The evidence at trial established that Chicago police officers Joseph Montesdeoca, Pablo Delgado, Orlando Long and Brock[1] arrived in the vicinity

---

[1] Officer Brock did not testify and his first name does not appear in the record.

of 108th Street and South Eggleston Avenue in Chicago at 2 a.m. on August 18, 2012, in response to the report of an armed man in that area.

¶ 6        Officer Joseph Montesdeoca testified that he arrived with his partner Officer Pablo Delgado in an unmarked Chevy Tahoe. The two officers were in plain clothes, but wearing bullet-proof vests with silver badges on the front and the word "Police" on the back.  After Montesdeoca stopped their vehicle and exited, defendant looked at him, grabbed the right side of his waistband, and ran south on Eggleston Avenue. Montesdeoca chased him on foot. As they ran, defendant looked back, pulled a gun out from his right side, dropped it on the ground and then ran into a yard, through a gangway and into a rear yard with a six-foot chain link fence. As Montesdeoca chased defendant, Montesdeoca yelled that he was a police officer and told defendant to stop, but defendant did not stop.  After defendant jumped the chain link fence, he fell. After Montesdeoca jumped the fence, he found defendant hiding near the basement door of the house. Montesdeoca told him to stop and handcuffed him.  After handcuffing defendant, Montesdeoca was joined by Officer Long, who had the gun that defendant had dropped.  On cross, Montesdeoca admitted that it would have been difficult to observe the items identifying him as a police officer.

¶ 7        Officer Pablo Delgado testified that he and his partner, Officer Joseph Montesdeoca, were 15 to 20 feet away from defendant when they first observed

defendant on Eggleston Avenue and that defendant was the only person on the street at that time. Montesdeoca, who was driving, stopped their vehicle and both officers exited. As Montesdeoca approached, defendant grabbed his waistband on the right side and ran. After defendant ran a short distance he pulled a gun out of his waistband and dropped it on the front yard of a house. While Montesdeoca pursued and arrested defendant, Delgado went to retrieve the gun.

¶ 8    Later, after defendant was arrested and standing by a police vehicle, Delgado read defendant his *Miranda* rights. Defendant acknowledged that he understood his rights and agreed to speak with the officer. Defendant stated that he was carrying the gun for protection. However, on cross-examination, Delgado admitted that this statement was not memorialized or signed by defendant.

¶ 9    Officer Orlando Long testified that he was with his partner, Officer Brock, in a marked police vehicle when they received a call about a man with a gun. Officers Montesdeoca and Delgado arrived first, exited their vehicle and began chasing someone. Long exited his vehicle and retrieved a gun that was lying in the front yard of a home on Eggleston Avenue. On cross-examination, Long admitted that he did not use gloves when he retrieved the gun, that he did

not place it in an envelope or bag at the scene, and that the gun was not examined for fingerprints.

¶ 10      The parties then stipulated that defendant had never been issued a Firearm Owners Identification card, and the State rested.

¶ 11      The defense then called defendant and his friend, Joshua Reed. Reed testified that he was 22 years old at the time of the second trial, which was held on October 22, 2015, over three years from the date of the offense.  Reed testified that he had known defendant since childhood. At the time of defendant's arrest, they spent a lot of time together, but they had since had a falling out and were no longer friends at the time of trial.  Reed did not observe a gun in defendant's possession and was not aware that defendant ever carried a gun.

¶ 12      Reed attended a party with defendant and Allen Carley at 108th Street and Eggleston Avenue at 9 or 10 p.m. The party, which lasted about two hours, was attended by 15 to 20 people, and strippers performed. After the party ended, there were about 15 people, including Reed, in front of the house, talking and heading to their vehicles. As they were standing in front of the house, a vehicle drove down Eggleston Avenue very fast and without lights on. Everyone scattered and Reed ran because he thought it could be a drive-by

shooting. Reed and Carley ran in the same direction but he did not observe where defendant ran and did not observe defendant again that night.

¶ 13    On cross-examination, the State asked Reed a series of questions which defendant discusses on appeal. As a result, we provide the colloquy below:

"Q. And you said that was a stripper party, right?

A. Yes, sir.

Q. And were people drinking at the party?

A. I'm actually not too sure.

Q. There were 15 to 20 people there at the party?

A. Yes, sir.

Q. And you were all in the same room, right?

A. A lot—some people were in different areas.

Q. Okay. Did you stay in the same room the whole night?

A. Relatively, it was like—it was sort of two rooms, living room, dining room.

Q. Okay. And were those two rooms next to each other?

A. Yes.

Q. Okay. And you were at the party for a few hours, right?

***

A. Yes, yes.

Q. And it's your testimony here today that you don't know if people were drinking?

A. No sir. I don't.

Q. What about smoking weed? Were people smoking weed?

DEFENSE COUNSEL: Relevance.

THE COURT: Overruled.

A. I'm not sure.

Q. Were you drinking?

A. No.

Q. Were you smoking weed?

A. No.

Q. What about the defendant? Was he drinking?

A. No.

Q. Did he smoke any weed?

A. No, not to my knowledge.

Q. What about your friend Allen?

A. Not to my knowledge.

Q. So yes or no.

A. No."

¶ 14      Defendant testified that he had turned 20 years old the month before the party and that he arrived at the party with Joshua Reed and Allen Carley. When it ended, there were 15 to 20 people standing outside, in small groups. Reed, Carley and defendant stopped to talk to friends in the neighborhood.  As they were standing outside, defendant heard yelling and observed a vehicle driving fast down the street, with its headlights off. Fearing a drive-by shooting, defendant ran south down Eggleston Avenue, while Reed and Carley ran in a different direction.  Defendant ran through a yard and a gangway, and jumped a gate into a backyard. When he did not hear yelling or gunshots, he went to the gate and observed a police officer in the front yard with a flashlight.  As the officer approached the gate, he pointed his gun at defendant and told him to go down on the ground.  After defendant complied, the officer jumped the fence and handcuffed defendant's hands behind his back. The officer lifted defendant over the fence with the help of other officers and placed defendant into the back of a police vehicle.

¶ 15      Defendant did not know why he was arrested; he was not read his rights; and he did not speak to the officers. After he arrived at the police station, he was informed why he had been arrested.  Defendant testified that he did not own a gun and did not have a gun at the party or after it.

¶ 16         On cross-examination, the State asked defendant a series of questions which defendant discusses on appeal. As a result, we provide the colloquy below:

"Q. And during the course of this stripper party, were you drinking?

A. No.

Q. Were your friends drinking?

A. No.

Q. And were you smoking weed?

A. No.

Q. Anyone else smoking weed?

A. No.

Q. So everyone was enjoying the party sober; is that right?

A. Yes.

Q. Okay. No one else at the party was having any alcohol or weed at the time?

A. Not that I'm aware.

***

Q. You're having a good alcohol-free time, right?

A. No. No.

Q. No? And [*sic*] alcohol free time, is that right?

A. Yes. "

¶ 17     The State then asked the following questions concerning the strippers:

"Q. Okay.  And you were hanging out at the party for two or three hours, right?

A. Yes.

Q. Are you spending money on the strippers?

A. I threw a few dollars, yeah.

Q. You threw a few dollars.  Where did you throw the few dollars?

A. On the floor.

Q. On the floor.  And did the women pick it up.

A. Yes.

Q. Okay.  And what about your friends?  What about Joshua Reed?

A. I believe they did.

Q. You believe they did what?

A. Throw money.

Q. At the strippers?

A.  I believe so.

Q. Okay.  And are these dollars? Are these 5s? Are these 10s?

A. Dollars.

Q. Okay. So you were tipping the girls dollars; is that right?

A. Yes.

Q. And you don't know where they came from or whether or not there were actually professional strippers, right?

DEFENSE COUNSEL: Objection to the form of the question where he came from.

THE COURT: It's already been asked and answered. I'm going to request that you move on."

When defense counsel objected "to the form" of the last question, the trial court directed the prosecutor to "move on."

¶ 18 During closing argument, defense counsel argued that it was not illegal to watch strippers and that it was "offensive that in a case where marijuana and not illegal drugs or illicit contraband of any type are the issue that the State can continue to hammer home that [defendant] and his friends must have been smoking marijuana because they're young men in a bad neighborhood."

¶ 19 In rebuttal argument, the State responded:

"Now you need to look at the story that was told to you by the defendant and his friend because there are certain things in the story that just don't make sense.

It's clear that what they're telling you is a story that was tailored for you. They'll admit certain things. They won't admit others. There's a reason why we're asking you [*sic*] certain questions about the party.

They'll admit there were strippers. They won't even admit there were people at the party that might have been drinking. It's silly."

¶ 20 The jury found defendant guilty of AUUW. Defendant filed a posttrial motion for a new trial claiming that the trial court had erred in denying defendant's request to have the gun tested for fingerprints and that the State's cross-examination created undue prejudice. The trial court denied the motion and, after considering factors in mitigation and aggravation, sentenced defendant to one year with IDOC. This timely appeal followed.

¶ 21                                      ANALYSIS

¶ 22 On appeal, defendant claims: that the State failed to perfect its impeachment of defense witnesses; that the trial court abused its discretion by denying defense counsel's request to have the gun tested for fingerprints; and that the fines and fees order must be corrected. The State agrees that certain fines and fees must be corrected. For the following reasons, we affirm defendant's conviction and order the correction of certain fines and fees.

¶ 23                                    I. Impeachment

¶ 24        First, defendant claims that this court should reverse his conviction and remand for a new trial because the State failed to perfect its impeachment of defendant and Joshua Reed on the issues of underage drinking and marijuana use.

¶ 25        The State argues that the issue is forfeited.  To preserve a purported error for consideration by a reviewing court, a defendant must both:  (1) object to the error at trial; and (2) raise the error in a posttrial motion.  *People v. Sebby*, 2017 IL 119445, ¶ 48.  "Failure to do either results in forfeiture."  *Sebby*, 2017 IL 119445, ¶ 48.   In the case at bar, defense counsel objected at trial to one question on the ground of relevance but then let the vast majority of the questions on strippers, alcohol and marijuana go by without an objection, until a question about whether the strippers were professionals.  Defense counsel objected only to the form of the question, and the trial court instructed the prosecutor to "move on." The objections to a couple out of a number of questions on these subjects is not enough to preserve this issue for review.  In addition, defendant did not object at trial on the ground of imperfected impeachment, which is the issue he raises now on appeal.  In his appellate brief, defendant concedes that he did not object specifically at the time.  Thus, the issue is forfeited for our review.

¶ 26    However, the plain error doctrine permits a reviewing court to consider an unpreserved error: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant argues plain error under both prongs of the plain error doctrine.

¶ 27    The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565.

¶ 28    "[It] is proper on cross-examination to develop all circumstances within the knowledge of the witness that explain, qualify, discredit or destroy his direct testimony." *People v. Stevens*, 2014 IL 116300, ¶ 16. "Additionally, '[a]ny permissible matter which affects the witness' credibility may be developed on cross-examination.' " *Stevens*, 2014 IL 116300, ¶ 16 (quoting *People v. Kliner*, 185 Ill. 2d 81, 130 (1998)). "The extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial court." *Stevens*, 2014 IL 116300, ¶ 16. An abuse of discretion occurs only when the

trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 29     In the case at bar, we cannot say that the trial court abused its discretion when it did not, *sua sponte*, cut off further questioning until an objection by defense counsel.  When the defense counsel did object—although on the basis of form—the trial court did instruct the prosecutor to "move on."  Since we cannot find a clear or obvious error, there can be no plain error.

¶ 30     Defendant argues that " '[i]t is improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information.' "  *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 57 (quoting *People v. Olinger*, 112 Ill. 2d 324, 341 (1986)).

¶ 31     Defendant argues that it was improper for the State to ask extensive questions about strippers, alcohol and marijuana. However, with respect to strippers, it was the defense that interjected this piece of information into the trial, offering the stripper party as an alibi as to where defendant was when the police arrived—as opposed to walking up Eggleston Avenue alone as the officers had testified.  The State was exploring the veracity of his alibi by cross-

examining about the dollar bills that defendant and Reed claimed that they merely tossed on the floor and that the women then had to pick up.

¶ 32 On appeal, the State argues that a late-night, alcohol-free, stripper party strains common sense and plausibility; and, thus, the State argues that the prosecutor was cross-examining to probe their credibility.  At trial, defendant's friend, Joshua Reed, testified that, although he was present for a few hours and the party occurred in only two rooms, he was not sure whether people at the party were drinking or smoking marijuana.  In contrast to Reed, defendant was sure, and sure that they were not. Considering the contrast between their answers, the State explored this issue on its cross-examination of defendant.

¶ 33 In response, defendant relies heavily on this court's opinion in *People v. McCoy*, 2016 IL App (1st) 130988.  As we explain below, *McCoy* is nothing like the case at bar.

¶ 34 In *McCoy*, the following exchange occurred during the State's cross-examination of the defendant:

" '[ASSISTANT STATE'S ATTORNEY]:  You actually told him that if he [the dying victim] said anything you would kill his family, didn't you?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

[ASSISTANT STATE'S ATTORNEY]:  Did you?

[DEFENDANT]:  No.

[ASSISTANT STATE'S ATTORNEY]:  No?' " *McCoy*, 2016 IL App (1st) 130988, ¶ 40.

In *McCoy*, the prosecutor essentially told the jury, in a flat-out statement, that defendant "*actually told*" (emphasis added) the dying murder victim "that if he said anything" defendant "would kill his family." *McCoy*, 2016 IL App (1st) 130988, ¶ 40. The prosecutor made this assertion, without any evidence whatsoever that such a statement had been made. *McCoy*, 2016 IL App (1st) 130988, ¶ 58.

¶ 35        In marked contrast to *McCoy*, the prosecutor in the instant case asked questions and did not state that defendant "actually told" the officers about drugs or alcohol; the subject of those questions was alive and well and on the witness stand and, thus, able to deny, and did; defense counsel did not object to most of the questions; and when defense counsel did eventually object, the trial court told the prosecutor to "move on."  As a result, we do not find defendant's reliance on *McCoy* persuasive.

¶ 36        For the foregoing reasons, we cannot find a clear and obvious error and, thus, there can be no plain error.  *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565.

¶ 37     Defendant asks this court that, if we do not find plain error, to consider the issue alternatively as ineffective assistance of counsel. Defendant argues that trial counsel rendered unreasonable assistance by failing to preserve the impeachment issue for appeal.

¶ 38     To determine whether a defendant was denied the effective assistance of counsel, we apply the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* test). Under *Strickland*, a defendant must show both that (1) his counsel's performance was deficient; and (2) his counsel's deficient performance prejudiced him. *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). However, the failure of counsel to argue an issue or violation cannot satisfy either prong of *Strickland*, where the issue or violation did not occur. *People v. Jones*, 2018 IL App (1st) 151307, ¶ 19. In the case at bar, the State was asking questions about whether there was, or was not, alcohol or marijuana consumption at a stripper party, where the defense first introduced the party as an alibi for defendant's whereabouts, and where one defense witness was not sure if there was such consumption while defendant was adamant that there was not. Unlike both *McCoy* or *People v. Robertson*, 198 Ill. App. 3d 98 (1990), which defendant also cites, the State did not assert that it was in possession of a

statement that it did not produce.[2] We cannot find that counsel rendered unreasonable assistance for failing to raise the impeachment issue when such an issue was unlikely to succeed.

¶ 39       In sum, we cannot find either plain error or ineffective assistance of counsel on this basis.

¶ 40                                    II. Fingerprint Testing

¶ 41       Second, defendant claims that the trial court erred by not allowing defense counsel to have the gun tested for fingerprints.  However, he does not claim bad faith on the part of the police in failing to preserve the gun so that it could be tested for prints. See *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process").

¶ 42       Defendant concedes that the trial court's finding is subject to review only for an abuse of discretion. *People v. Sutton*, 349 Ill. App. 3d 608, 618-19 (2004) (the trial court's denial of the defendant's request to retest DNA evidence was

---

[2] In *Robertson*, "the prosecutor insinuated that" the defendant's mother "had made several statements to an investigator, which she either denied or could not recall." *Robertson*, 198 Ill. App. 3d at 107.  However, the "State never offered the testimony of the investigator or his report to complete the impeachment of the witness." *Robertson*, 198 Ill. App. 3d at 107.  The appellate court reversed due to "the State's repeated failure to perfect its impeachment." *Robertson*, 198 Ill. App. 3d at 100.

subject to an abuse-of-discretion review). As we observed above, an abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Patrick*, 233 Ill. 2d at 68.

¶ 43      In the case at bar, we cannot find an abuse of discretion by the trial court. The trial court found that, due to the way that the gun was handled at the first trial, any prints were likely obliterated.  Defendant argues that the trial court's reasoning is flawed because testing the gun was the only way to determine what effect, if any, handling and time had on any original fingerprints on the gun. However, this argument is duplicitous.  Defendant did not want the gun tested in order to discover the effects of handling on the gun.  He wanted the testing to argue that his fingerprints were not on it—which could easily be due to handling rather than their original absence.

¶ 44      The trial court found that such testing would no longer have any evidentiary value.  As the trial court succinctly phrased it, "the time to test this weapon for prints has come and gone because it hasn't been handled as a piece of evidence to preserve any original prints."  We cannot find that the trial court abused its discretion in finding that a fingerprint test, whatever its results, no longer had any evidentiary value. Defendant does not dispute the trial court's factual finding that the gun was handled at the first trial in a way that was likely

20

to obliterate prints; and he concedes that the trial court permitted defense counsel to argue that the gun was never tested. Thus, we cannot find an abuse of discretion on these facts.

¶ 45                                    III. Fines and Fees

¶ 46        Lastly, defendant asks this court to correct the fines and fees order entered in this case. The State concedes defendant is correct with respect to half of them. With the half that are in dispute, our supreme court recently ruled with respect to all but one in the State's favor. *People v. Clark*, 2018 IL 122495, ¶ 51. With respect to that one, a $25 "Court Services (Sheriff)" charge (55 ILCS 5/5-1103 (West 2016)), the defendant in *Clark* withdrew his challenge to it, so our supreme court did not make a specific finding as to whether it was a fine or a fee. *Clark*, 2018 IL 122495, ¶ 5. A fee "is not subject to defendant's presentence credit." *Clark*, 2018 IL 122495, ¶ 27. However, the logic of *Clark* compels us to find that the "Court Services (Sheriff)" charge is also a fee.

¶ 47        According to the statute, the purpose of this charge is to "defray[ ]court security expenses incurred by the sheriff in providing court services or for any other court services deemed necessary by the sheriff to provide for court security." 55 ILCS 5/5-1103 (West 2016). In the statute itself, the legislature labeled this charge a "fee." 55 ILCS 5/5-1103 (West 2016). In *Clark*, when our supreme court found that the $2 State's Attorney Records Automation charge

was a fee, it based its decision on the fact that the legislature had labeled this charge as a fee, that this label is evidence of the legislature's intent, and that "[e]very prosecution necessarily involves the state's attorney and necessarily generates records, which must be automated." *Clark*, 2018 IL 122495, ¶¶ 26-27. Similarly, in the case at bar, the legislature has labeled the charge as a fee, and every prosecution necessarily involves the sheriff and court services.

¶ 48 In *Clark*, the supreme court also found that the Felony Complaint Filed, (Clerk) charge was a fee, because the legislature had labeled it as a fee, and its purpose was "to reimburse the court for the costs of filing a felony case." *Clark*, 2018 IL 122495, ¶¶ 32-33. Similarly, in the case at bar, the legislature has labeled the charge as a fee, and its purpose is to reimburse the sheriff for the security expenses incurred in providing court services.

¶ 49 We do not see a need to compare every charge discussed in *Clark* to the fee at issue, although they would all support our finding. The couple of examples discussed above are sufficient to establish that this charge is a fee.

¶ 50 In sum, pursuant to our authority under Illinois Supreme Court Rule 615, we reduce the fines and fees order by $145 for a new total of $749. *People v. Brown*, 2017 IL App (1st) 150203, ¶ 43. Since the State has conceded these issues on appeal, we vacate the $25 "Quasi-Criminal Complaint/Conviction (Local Prosecutor)" charge, the $5 "Electronic Citation Fee", and the $50

Quasi-Criminal Complaint Conviction (Clerk)" charge; and we find that the defendant is entitled to apply his presentence credit against the $15 State Police Operations Fee and the $50 Court Systems Fee.

¶ 51                                    CONCLUSION

¶ 52        For the foregoing reasons, we affirm defendant's conviction and sentence, but correct his fines and fees order as described above.

¶ 53        Affirmed; fines and fees order corrected.