NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180337-U

NO. 4-18-0337

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 28, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| BRET DAVIS, | ) | No. 16CF163 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding (1) the State did not commit
prosecutorial misconduct, (2) trial counsel did not provide ineffective assistance
of counsel, and (3) defendant waived any plain-error challenge to the aggravated
assault instructions.

¶ 2    In October 2016, the State charged defendant, Bret Davis, by indictment with one

count of attempt (murder) (720 ILCS 5/8-4(a) (West 2014)) (count I), one count of aggravated

domestic battery (720 ILCS 5/12-3.3(a) (West 2014)) (count II), two counts of aggravated

battery (720 ILCS 5/12-3.05(f)(1) (West 2014)) (counts III and IV), two counts of domestic

battery (subsequent offense felony) (720 ILCS 5/12-3.2(a)(1) (West 2014)) (counts V and VI),

and one count of aggravated assault (720 ILCS 5/12-2(c)(7) (West 2014)) (count VII).  The

charges stemmed from a September 26, 2016, physical altercation between defendant and his

then wife, Kristen.  In February 2017, the State also charged defendant with one count of

domestic battery (subsequent offense felony) (720 ILCS 5/12-3.2(a)(1) (West 2014)) (count VIII) and one count of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2014)) (count IX).

¶ 3        Following a March 2018 trial, a jury found defendant guilty on all counts. In May 2018, defendant filed a motion for a new trial. The trial court denied the motion. The court sentenced defendant on counts I, VII, VIII, and IX. Subsequently, defendant filed a motion to reconsider sentence. The court determined it considered an improper aggravating factor and resentenced defendant to 19 years' imprisonment for attempt (murder) (count I), 2 years' imprisonment for aggravated assault (count VII), 2 years' imprisonment for domestic battery (subsequent offense felony) (count VIII), and 3 years' imprisonment for aggravated battery (count IX), all to run concurrently.

¶ 4        Defendant appeals, arguing (1) the State committed prosecutorial misconduct denying defendant a fair trial where (a) it improperly impeached defendant by alleging during cross examination that (i) defendant's wounds were self-inflicted and (ii) defendant attempted suicide because he felt guilty, (b) it inflamed the passions of the jury by comparing the victim's blood loss to a scene from the movie "Carrie," (c) it violated the trial court's orders *in limine* by (i) asking the victim about the no-contact order that was entered after defendant's prior arrest for domestic battery and (ii) stating that certain wounds were "defensive" wounds, and (d) cumulatively, the prosecutorial misconduct was plain error, and to the extent trial counsel failed to preserve the issues, he provided ineffective assistance of counsel; (2) trial counsel provided ineffective assistance of counsel by failing to file a motion to sever the attempt murder charge (count I) and the aggravated assault charge (count VII) from the other counts; and (3) defendant was deprived of a fair trial where (a) trial counsel failed to offer a "necessity" jury instruction relating to the aggravated assault charge (count VII) and (b) the trial court improperly

- 2 -

instructed the jury on aggravated assault and trial counsel failed to object to the instruction given. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6         In October 2016, the State charged defendant with attempt (murder) (720 ILCS 5/8-4(a) (West 2014)) (count I), aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2014)) (count II), aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2014)) (counts III and IV), domestic battery (subsequent offense felony) (720 ILCS 5/12-3.2(a)(1) (West 2014)) (counts V and VI), and aggravated assault (720 ILCS 5/12-2(c)(7) (West 2014)) (count VII). The charges stemmed from a September 26, 2016, physical altercation between defendant and Kristen. In February 2017, the State also charged defendant with domestic battery (subsequent offense felony) (720 ILCS 5/12-3.2(a)(1) (West 2014)) (count VIII) and aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2014)) (count IX).

¶ 7                                   A. Pretrial Motions

¶ 8         In April 2017, the State filed a motion *in limine* seeking permission to offer evidence regarding prior domestic violence incidents to demonstrate defendant's propensity pursuant to section 115-7.4(a) of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-7.4(a) (West 2014)). Specifically, the State wanted to introduce evidence regarding an October 9, 2014, domestic battery (Woodford County case No. 14-CM-323) where defendant pled guilty to committing domestic battery against Kristen. The State alleged the following:

> "[T]he evidence expected to be heard from the 2014 incident
> includes the defendant seeing his wife, Kristen Davis, with another
> man and then forcing Kristen Davis into a truck and driving off

into an unincorporated area of Woodford County, Illinois, where

Kristen Davis will testify that the defendant threatened to kill her,

restrained her, and drug [*sic*] her out of the truck. Due to that

incident an order of protection was entered and the defendant was

not allowed to have contact with Kristen Davis until a few weeks

prior to the September 26, 2016[,] incident. The evidence will

establish the September 26, 2016[,] incident was the first time that

the defendant was alone with Kristen Davis in two years."

¶ 9        During a June 2017 hearing, Kristen recounted the details of the October 9, 2014, incident, and the trial court took judicial notice of Woodford County case No. 14-CM-323. Kristen also testified regarding two other incidents involving defendant that took place in July 2014. She stated defendant slapped her during the first incident and threw things around the room in the second incident. Over defense objection, the court ruled Kristen could testify at trial to her version of the October 9, 2014, incident. However, the court declined to allow evidence regarding defendant's arrest and guilty plea in Woodford County case No. 14-CM-323.

¶ 10        In January 2018, defendant filed a motion *in limine* asking the trial court, in relevant part, to prohibit the State and any of its witnesses from testifying that (1) defendant had self-inflicted lacerations, (2) defendant attempted suicide by jumping off a bridge as a result of the incident, and (3) the alleged victim had wounds or injuries that were defensive in nature. At a February 2018 hearing on defendant's motion *in limine*, the State admitted not having a doctor to lay the necessary foundation for testimony that defendant's wounds were self-inflicted. The State said it would not go down that road unless it could lay a proper foundation or the defense

opened the door to that line of questioning. The court granted defendant's motion *in limine* as to the three issues. However, as to the "defensive" wounds evidence, the court stated,

> "But that certainly doesn't prohibit the alleged victim from testifying in terms of what she did in terms of the occurrence that took—allegedly took place in terms of how she may or may not have held her hands or that type of thing. And the jury can draw their own conclusion in terms of whether wounds were defensive and how the wounds occurred. But unless we have the appropriate foundation to go ahead and say these wounds were of a defensive nature, the court will grant the motion."

¶ 11                                    B. Defendant's Jury Trial

¶ 12          In March 2018, defendant's jury trial commenced. We summarize only the facts necessary for the resolution of this appeal.

¶ 13                                    1. *The State's Evidence*

¶ 14          Kristen testified she was married to defendant for almost 18 years and they had three children together. The State asked Kristen whether there was ever some type of "no-contact" between the defendant and her. Kristen indicated that "right after that happened [(the October 2014 incident)] he wasn't allowed to contact me ***." The defense objected and asked for a mistrial or that Kristen's testimony be stricken and further testimony from Kristen be barred as violating the court's order *in limine*. The trial court overruled the objection and declined to grant the requested relief.

¶ 15          Kristen also testified about the September 26, 2016, incident. On the morning of September 26, 2016, defendant entered the family home and asked to talk with Kristen about the

kids. Kristen and defendant sat down at the kitchen table, and defendant told Kristen he loved her and now that he was home, he wanted them to be a family. Kristen told defendant they were getting divorced. Kristen told defendant she could never trust him not to hurt her again, and he said that he would never hurt her again.

¶ 16 Kristen testified her conversation with defendant lasted about 10 minutes or less. Kristen wanted to change visitation arrangements for the kids, to make things more even. Kristen indicated that, after the conversation ended, she and defendant stood up and as she walked away, defendant said, "no, no, I'm not doing this. I'm going to have my kids every night." At that point, Kristen was standing in front of the stairs to the basement. Kristen testified defendant pushed her in the chest with so much force she fell all the way down the basement stairs to the second to last stair. Kristen approximated there were 13 stairs down to the basement. When Kristen fell, she landed on her back. Kristen testified that when she landed at the bottom of the stairs, defendant ran toward her and pulled a knife out of his right pocket.

¶ 17 When Kristen tried to move back defendant stabbed her in the face. Kristen testified the stab felt like it was in her neck. Kristen tried again to scoot away and roll over. Defendant kept stabbing the back of Kristen's head, neck, and back. Kristen stated she tried to crawl toward the curio cabinet but defendant was standing near the cabinet so she crawled toward the couch. When Kristen made it to the couch, she spotted workout weights nearby. Defendant kept stabbing Kristen, and she tried to defend herself with her hands. Kristen tried to get into a ball next to the couch, but defendant stabbed her in the neck and left the knife in her neck by her ear. Kristen pulled the knife out of her neck with her right hand. Kristen testified she contemplated stabbing defendant but realized she could not do it. Instead, she dropped the knife at defendant's feet. Defendant stood right above her.

¶ 18        After Kristen dropped the knife, something hit her in the head. Kristen testified that she thought it was a hammer. Kristen tried crawling away and ended up in the corner next to the weights. Kristen tried to cover her head, but defendant hit her several times. Kristen testified she was on her stomach with her head toward the couch. Kristen stated defendant also hit her on her left leg. Kristen testified that when defendant hit her it felt like a hammer hitting her and when he stabbed her, she felt sharp pains and could see blood everywhere. Kristen begged defendant to stop, but he remained silent. Then, she stopped moving and crying out. Kristen then felt defendant stop attacking her, so she ran upstairs to her Tahoe and drove down the street to her friend Wendy Gardner's house. Wendy's boyfriend, Jason Damron, helped Kristen onto Wendy's porch and had her sit down. As Kristen sat on the porch, she saw defendant drive by in his pickup truck. Wendy called the police and gave Kristen towels. Kristen testified she never struck defendant during the altercation nor did she stab or slash him with the knife.

¶ 19        Wendy, Kristen's friend, testified she lived down the street from Kristen. Wendy testified that on September 26, 2016, she saw Kristen pull into her driveway and almost hit her boyfriend Jason's truck. When Kristen got out of her Tahoe, Wendy observed Kristen was covered in blood. Wendy testified Kristen had stab wounds and "Kristen has long hair, so you couldn't see how many, but her entire hair was dripping in blood. She had been cut on her neck. She had some kind of something on the side of her head where you could see through it." Jason testified fatty tissue was visible in one of Kristen's wounds and she had wounds that were bleeding heavily. Specifically, Jason stated he was concerned with "the inch and-a-half hole in her head." Jason indicated he stayed with Kristen until the ambulance came and took her away.

¶ 20        Dr. Rozana Dwyer, Kristen's treating physician, testified she washed Kristen's wounds and repaired Kristen's 13 lacerations. Dr. Dwyer also testified Kristen had a large bruise

on her left thigh. In Kristen's computerized tomography (CT) report, Dr. Dwyer found the overall impression "was there was no acute intercranial abnormality, and there was acute posttraumatic left frontal left parietal soft tissue scalp contusions."

¶ 21 Winston Whitten, a construction worker, testified that on September 26, 2016, around 11 a.m., he was working on Fandel Road in Germantown Hills, Illinois. He was flagging in front of some "asphalt guys" doing some "curb stuff" after putting in a sidewalk. Whitten testified that while he was holding the flag, he heard tires squeal. Then, he saw a big blue truck coming at him. Whitten tried to get the truck to stop, but it would not, so he moved out of the way and raised his flag up. Whitten testified he thought the truck was going to run him over. Whitten stated that if he had not moved out of the way, the truck would have run him over.

¶ 22                                      2. *The Defense*

¶ 23 Following the State's case-in-chief, defendant moved for a directed verdict, which the trial court denied. Defendant then testified to the incident that occurred on September 26, 2016. On September 26, 2016, defendant planned to take time off work to talk to his attorney to get ready for the divorce mediation. That morning, defendant went to the family home to ask Kristen to talk. Defendant and Kristen sat down at the kitchen table to talk about the kids. Defendant testified that Kristen did most of the talking. Defendant said that Kristen told him she wanted a divorce. When the conversation ended, they both stood up from the table. Kristen turned to go down the hallway toward the master bedroom, and defendant thought she was going to leave. Defendant started to walk behind her to see her off when she turned around and said, "I hate you" and came at him with her hands. Defendant testified Kristen came at his shoulder and his neck area.

¶ 24 Defendant testified he thought Kristen was going to batter him so he shoved her back to protect himself. He pushed her just hard enough to create a little distance. Kristen hit the wall of the stairwell at an angle. Kristen then went forward and hit the stairs and rolled once, shoulder over shoulder. She bumped down to about two feet past the bottom of the stairs, and defendant stood at the top of the stairs. Defendant testified the stairs are kind of steep but he thought Kristen embellished the seriousness of the fall. Defendant then started down the stairs to ask her if she was okay. In the process of Kristen getting up, she came at defendant as he was bending down to check on her and slashed his neck several times.

¶ 25 Defendant testified that Kristen cut him. He did not initially realize she cut him until he felt a burning type of feeling and saw the knife in her hand. Defendant thought his life was in danger. Kristen then started slashing at defendant's neck, and he shoved her back. Kristen hit the couch and dropped the knife, and defendant grabbed it. Defendant stated his purpose was to get the knife away from Kristen. However, Kristen came at defendant again, hitting, punching, swinging, and kicking him.

¶ 26 Defendant testified that Kristen was injured in the fight. Defendant did not remember stabbing her but rather was defending himself and trying to keep her away. Kristen's lacerations to her cheek and the base of her head, shoulder, and back came about in the course of the fight. Defendant testified he felt like he could die.

¶ 27 When Kristen's aggression slowed, defendant dropped the knife, and she grabbed it and cut defendant's wrist. Defendant stated he was trying to protect himself with his hands up, and she slashed him across the arm. He then saw the baseball bat out of the corner of his eye. He grabbed the bat and swung, hitting Kristen in the leg. She went down on her butt but still had the knife. Defendant then hit her on the top of the head with the bat. His second shot with the

bat caused her to drop the knife. He picked up the knife and looked up and she was gone. He went upstairs and did not see her but then heard her car door shut. Defendant testified he feared Kristen had a pink gun in the house or in her vehicle, so he went back downstairs and dropped the knife.

¶ 28　　　　After defendant believed Kristen left in her Tahoe, he started to head upstairs when he felt woozy. He was going to sit down, but he realized he needed immediate medical attention. Defendant went outside to his truck and pulled out of the driveway. He went past Wendy's house and saw Kristen's Tahoe in her driveway. He saw Kristen standing in the doorway of the Tahoe. He left the neighborhood driving quickly and turned right on Fandel Road.

¶ 29　　　　Defendant saw a road crew on the left side of the road. He was in the right lane, and he testified he could not stop because he needed immediate medical attention for his injuries. Defendant testified he was not driving that fast but he did go through the construction zone. He veered around the flag man but never intended to hit the flag man. Something hit defendant's truck as he drove past the construction worker holding the flag. He then turned right onto Route 116, driving quickly. He took the first exit ramp for Route 150. He went around a vehicle approaching a bridge, and the next thing he knew he was looking up, the hood of the truck was wrinkled, and he had been jostled around. He was not wearing his seatbelt. After the crash, he got out of his truck, and his next memory was of being in the water, looking up, and seeing people looking down at him. He was treated at the hospital and received sutures to his neck. He had surgery on his arm for significant nerve damage and an infection.

¶ 30    On cross-examination, over objection, the State asked defendant if (1) his wounds were self-inflicted, (2) he drove into the bridge intentionally, and (3) he jumped into the river to kill himself. Defendant said no.

¶ 31    Multiple people testified to defendant's reputation in the community for being truthful and peaceful.

¶ 32                                3. *Jury Instructions*

¶ 33    The trial court instructed the jury on the aggravated assault charge (count VII) using two non-Illinois Pattern Jury Instructions. Specifically, the court instructed the jury that "A person commits the offense of aggravated assault when he operates a motor vehicle in a manner which places a person in reasonable apprehension of being struck by a moving motor vehicle."

¶ 34    The court also instructed the jury indicating, "Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 35                                4. *Closing Arguments*

¶ 36    During its initial closing argument, the State described Kristen being covered in blood when she approached Wendy's house. The State said, "[i]t was a scene from the movie 'Carrie' when Kristen Davis walked up to Wendy Gardner's house. She's bloody[.]" Defense counsel objected and stated there was no testimony regarding the movie "Carrie." The trial court sustained the objection. The State then went on as follows:

"She's bloody. She is bloody all over. You heard the

testimony from Jason Damron, Wendy Gardner. She has this hole

in her head, and she's bleeding profusely from it. A vicious attack

by the defendant caused her to bleed horribly from the top of her

head. That has been proven beyond a reasonable doubt."

¶ 37       The State also argued defendant's injuries were self-inflicted and that defendant tried to commit suicide. In rebuttal, the State argued the cuts on Kristen's hands were defensive wounds. Further, the State argued defendant lacked defensive wounds. Defense counsel objected and requested a corrective instruction. The court declined to give a corrective instruction but informed the State to stay away from the defensive wounds. The court also said, "The jury will be instructed that closing arguments are not evidence."

¶ 38                                5. *Verdict*

¶ 39       Following deliberations, the jury found defendant guilty on all counts.

¶ 40                C. Defendant's Posttrial Motion and Sentencing

¶ 41       In May 2018, defendant filed a motion for a new trial. The trial court denied the motion. The court sentenced defendant on counts I, VII, VIII, and IX. The court concluded an extended term sentence would not be appropriate. Subsequently, defendant filed a motion to reconsider sentence. The court determined it considered an improper aggravating factor and resentenced defendant to 19 years' imprisonment for attempt (murder) (count I), 2 years' imprisonment for aggravated assault (count VII), 2 years' imprisonment for domestic battery (subsequent offense felony) (count VIII), and 3 years' imprisonment for aggravated battery (count IX), all to run concurrently.

¶ 42       This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44            On appeal, defendant argues (1) the State committed prosecutorial misconduct

denying defendant a fair trial where (a) it improperly impeached defendant by alleging during

cross examination that (i) defendant's wounds were self-inflicted and (ii) defendant attempted

suicide because he felt guilty, (b) it inflamed the passions of the jury by comparing the victim's

blood loss to a scene from the movie "Carrie," (c) it violated the trial court's orders *in limine* by

(i) asking the victim about a no-contact order entered after defendant's prior arrest for domestic

battery and (ii) stating that certain wounds were "defensive," and (d) cumulatively, the

prosecutorial misconduct was plain error, and to the extent that trial counsel failed to preserve

the issues, he provided ineffective assistance of counsel; (2) trial counsel provided ineffective

assistance of counsel by failing to file a motion to sever the attempt murder charge (count I) and

the aggravated assault charge (count VII) from the other counts; and (3) defendant was deprived

of a fair trial where (a) his trial counsel failed to offer a "necessity" jury instruction relating to

the aggravated assault charge (count VII) and (b) the trial court improperly instructed the jury on

aggravated assault and trial counsel failed to object to the instruction given. We review each

issue in turn.

¶ 45            To preserve an error for consideration on appeal, a defendant must object to the

error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89

N.E.3d 675. Failure to do so constitutes forfeiture. *Id.* However, we may consider a forfeited

claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1,

1967). To prevail under the plain error doctrine, a defendant must first demonstrate a clear and

obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11

(2007). If an error occurred, we will only reverse where (1) "the evidence is so closely balanced

that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 46    Whether plain error occurred is a question of law we review *de novo*. *People v. Jones*, 2016 IL 119391, ¶ 10, 67 N.E.3d 256.

¶ 47                             A. Prosecutorial Misconduct

¶ 48    Defendant argues the State committed prosecutorial misconduct denying defendant a fair trial. Specifically, defendant asserts (1) the State impeached defendant during cross-examination and failed to perfect the impeachment, (2) the State improperly inflamed the passions of the jury during closing argument, (3) the State violated orders *in limine* by introducing evidence of a no-contact order and arguing Kristen suffered defensive wounds, and (4) any failure to preserve his claims of prosecutorial misconduct constituted ineffective assistance of counsel, and that, cumulatively, the prosecutorial misconduct in this case amounted to first-prong plain error. The State disagrees and responds the prosecutor's remarks during cross-examination and closing argument were proper. We agree with the State.

¶ 49    " 'Generally, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes thereof is to test the credibility of the witnesses.' " *People v. Brazziel*, 406 Ill. App. 3d 412, 430, 939 N.E.2d 989, 1006 (2010) (quoting *People v. Hall*, 195 Ill. 2d 1, 23, 743 N.E.2d 126, 139 (2000)). Further, prosecutors have wide latitude in closing arguments. *People v. Jackson*, 2020 IL 124112, ¶ 82. "Moreover, improper prosecutorial remarks can be cured by instruction to the jury to disregard argument not based on the evidence and to consider instead only the evidence presented." *People v. Rushing*, 192 Ill.

App. 3d 444, 454, 548 N.E.2d 788, 794 (1989). A reviewing court will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *People v. Perry*, 224 Ill. 2d 312, 347, 864 N.E.2d 196, 218 (2007). The appellate court reviews *de novo* assertions prosecutorial misconduct warrants a new trial. *People v. Wheeler*, 226 Ill. 2d 92, 121, 871 N.E.2d 728, 744 (2007). Even under *de novo* review, a defendant arguing prosecutorial misconduct bears the burden of proof. *People v. Hanson*, 273 Ill. App. 3d 332, 338, 652 N.E.2d 824, 829 (1995).

¶ 50                                                  1. *Improper Impeachment*

¶ 51          Defendant first argues the State committed prosecutorial misconduct denying defendant a fair trial where the State asked provocative leading questions on cross-examination and then failed to perfect the impeachment with extrinsic evidence. Specifically, defendant argues the State did not introduce any evidence during the course of the trial establishing (1) defendant's wounds were self-inflicted, (2) defendant drove into the side of the bridge to kill himself, or (3) defendant jumped into the river to kill himself. As such, the State never perfected its impeachment. The State disagrees and cites *People v. Lewis*, 2019 IL App (1st) 160705, 137 N.E.3d 848, in support of its argument. We find *Lewis* instructive.

¶ 52          In *Lewis*, the defendant argued that it was improper for the State to ask extrinsic questions about a party that involved strippers, alcohol, and marijuana. *Id.* ¶ 31. However, defendant introduced the evidence about the stripper party as an alibi for defendant's whereabouts. *Id.* On cross-examination, the State, in exploring the defendant's alibi, asked the defendant and a witness about the alleged party. *Id.*

> "At trial, [the] defendant's friend, Joshua Reed, testified that,
> although he was present for a few hours and the party occurred in

- 15 -

only two rooms, he was not sure whether people at the party were drinking or smoking marijuana. In contrast to Reed, [the] defendant was sure, and sure that they were not. Considering the contrast between their answers, the State explored this issue on its cross-examination of [the] defendant." *Id.* ¶ 32.

¶ 53 On appeal, the State argued "that a late-night, alcohol-free, stripper party strains common sense and plausibility; and, thus, the State argues that the prosecutor was cross-examining to probe their credibility." *Id.* Considering the contrast in the defendant and Reed's answers, the State explored the issue on cross-examination of the defendant. *Id.* The appellate court found the State did not err in its line of questioning. *Id.* ¶ 36. The court stated, "the prosecutor in the instant case asked questions and did not state that defendant 'actually told' the officers about drugs or alcohol; the subject of those questions was alive and well and on the witness stand and, thus, able to deny, and did ***." *Id.* ¶ 35.

¶ 54 The *Lewis* court also distinguished two cases defendant relies on in asserting that the State improperly impeached defendant on cross-examination. Defendant relies on *People v. Robertson*, 198 Ill. App. 3d 98, 555 N.E.2d 778 (1990) and *People v. McCoy*, 2016 IL App (1st) 130988, 63 N.E.3d 1006, in support of his argument.

¶ 55 In *Robertson*, "the prosecutor insinuated that the defendant's mother had made several statements to an investigator, which she either denied or could not recall." *Robertson*, 198 Ill. App. 3d at 107. However, the "State never offered the testimony of the investigator or his report to complete its impeachment of [the] witness." *Id.* The appellate court reversed due to "the State's repeated failure to perfect its impeachment ***." *Id.* at 100.

¶ 56        In *McCoy*, on cross-examination of the defendant, the prosecutor essentially told the jury, in a flat-out statement, that the defendant " 'actually told' " the dying murder victim " 'that if he said anything' " the defendant " 'would kill his family.' " *McCoy*, 2016 IL App (1st) 130988, ¶ 40. The prosecutor made this assertion, without any evidence that such a statement had been made. *Id.* ¶ 58.

¶ 57        The *Lewis* court stated that, unlike *Robertson* and *McCoy*, in *Lewis* the State "did not assert that it was in possession of a statement that it did not produce." *Lewis*, 2019 IL App (1st) 160705, ¶ 38. Actually, we find defendant's argument on this issue an attempt to place a square peg in a round hole. We reject defendant's attempt to shape this into a failure to perfect impeachment issue. What occurred in this case demonstrates the proper use of vigorous cross examination, asking questions based on reasonable inferences drawn from the evidence, and asserting ones theory of the case, all cornerstones of our system of advocacy.

¶ 58        Here, on cross-examination, over objection, the State asked defendant if (1) his wounds were self-inflicted, (2) he drove into the bridge intentionally, and (3) he jumped into the river to kill himself. Defendant testified no. We find the State's line of questioning was not improper where like in *Lewis*, defendant was able to deny those questions on the stand. The State asked defendant questions based on reasonable inferences drawn from the evidence. Here, the State's questions properly attacked defendant's credibility given the stark contrast between defendant's testimony and Kristen's testimony. See *Brazziel*, 406 Ill. App. 3d at 430. Moreover, unlike *Robertson* and *McCoy*, the State's questions on cross-examination did not suggest some piece of evidence which the State failed to produce. In trying to show Kristen to be credible and believable, the State, through cross-examination, offered the jury an explanation for defendant's injuries. Therefore, we find the cross-examination appropriate.

¶ 59                    2. *Inflame the Passions of the Jury*

¶ 60          Next, defendant argues the State committed further misconduct by seeking to

inflame the passions of the jury during closing argument by comparing Kristen's blood loss to a

scene from the movie "Carrie."

¶ 61          In its initial closing argument, the State described Kristen as being covered in

blood when she approached Wendy's house. The State argued, "[i]t was a scene from the movie

'Carrie' when [Kristen] walked up to Wendy Gardner's house. She's bloody[.]" Defense

counsel objected and stated there was no testimony regarding the movie "Carrie," and the trial

court sustained the objection. The State then went on as follows:

> "She's bloody. She is bloody all over. You heard the
>
> testimony from Jason Damron, Wendy Gardner. She has this hole
>
> in her head, and she's bleeding profusely from it. A vicious attack
>
> by the defendant caused her to bleed horribly from the top of her
>
> head. That has been proven beyond a reasonable doubt."

In defendant's motion for a new trial he argued, "The People improperly and prejudicially

argued that the victim looked like a scene from the movie 'Carrie' which inflamed and unfairly

prejudiced the jury against the Defendant." Thus, defendant preserved this alleged error.

¶ 62          As stated above, prosecutors are allowed great latitude during closing arguments.

*Jackson*, 2020 IL 124112, ¶ 82. Further, a reviewing court will consider the closing argument as

a whole, rather than focusing on selected phrases or remarks. *Perry*, 224 Ill. 2d at 347.

¶ 63          Here, the State's comment comparing Kristen's blood loss to a scene from the

movie "Carrie" did not amount to prosecutorial misconduct where the State made a single

reference to the movie. Also, when defense counsel objected, the trial court immediately

sustained the objection.  The State avoided referencing the movie again and instead went on to

discuss Kristen's injuries.

¶ 64       Moreover, the trial court instructed the jury that "[c]losing arguments are made by

the attorneys to discuss the facts and circumstances in the case and should be confined to the

evidence and to reasonable inferences to be drawn from the evidence.  Neither opening or

closing arguments are evidence, and any statement or argument made by the attorneys which is

not based on the evidence should be disregarded."  See *Rushing*, 192 Ill. App. 3d at 454.

¶ 65       Ultimately, the brief reference to the movie followed by the trial court's prompt

sustaining of the objection, and the jury instruction directing jurors how to consider opening

statements and closing arguments failed to deprive defendant of a fair trial and did not cast doubt

upon the reliability of the judicial process. See *People v. Johnson*, 208 Ill. 2d 53, 84, 803 N.E.2d

405, 423 (2003)

¶ 66                        3. *Motion in Limine Violations*

¶ 67       Next, defendant argues the State committed prosecutorial misconduct by violating

the trial court's order *in limine*, where the State (a) introduced evidence of a no-contact order

between defendant and Kristen and (b) described Kristen's wounds as "defensive."

¶ 68                             a. No-Contact Order

¶ 69       The State filed a motion *in limine* seeking to introduce evidence of defendant's

earlier domestic violence against Kristen in Woodford County case No. 14-CM-323.  The trial

court allowed the State to introduce evidence of the attack but ruled defendant's arrest and guilty

plea would not be admitted.

¶ 70       At trial, the State asked Kristen, "at some point in time was there some type of no-

contact?"  Kristen responded, "[r]ight after [the 2014 incident] happened he wasn't allowed to

- 19 -

contact me, or anything." The defense objected and moved for a mistrial or, in the alternative, asked that Kristen's testimony be stricken and further testimony from Kristen be barred as a violation of the court's order *in limine*. The trial court overruled the objection and declined to grant a mistrial.

¶ 71 We find the State's question to Kristen regarding "no contact" proper and conclude the trial court correctly overruled defendant's objection. The trial court's written order prohibited evidence regarding defendant's arrest and guilty plea in Woodford County case No. 14-CM-323. The State questioned Kristen whether there was some type of no-contact. Notably, the State failed to include the word "order" in its question. In addition, the State's line of questioning in no way elicited information regarding defendant's arrest or guilty plea in Woodford County case No. 14-CM-323. Thus, the State did not breach the order *in limine*.

¶ 72                                  b. Defensive Wounds

¶ 73 Defendant also argues the State violated the trial court's order *in limine* where, during closing argument, the prosecutor described Kristen's wounds as "defensive."

¶ 74 Defendant filed a motion *in limine* asking the trial court, in relevant part, to prohibit the People and any of its witnesses from testifying that (1) defendant had self-inflicted lacerations, (2) defendant attempted suicide by jumping off a bridge as a result of the incident, and (3) the alleged victim had wounds or injuries that were defensive in nature. During a pretrial hearing on defendant's motion *in limine* the State admitted it did not have a doctor who could lay a foundation for testimony that defendant's wounds were self-inflicted. The State said it would not go down that road unless it could lay a proper foundation or if the defense opened the door to that line of questioning. The trial court granted defendant's motion *in limine*, but as to the "defensive" wounds evidence, the court stated,

"But that certainly doesn't prohibit the alleged victim from testifying in terms of what she did in terms of the occurrence that took—allegedly took place in terms of how she may or may not have held her hands or that type of thing. And the jury can draw their own conclusion in terms of whether wounds were defensive and how the wounds occurred. But unless we have the appropriate foundation to go ahead and say these wounds were of a defensive nature, the court will grant the motion."

¶ 75 In rebuttal during closing arguments, the State argued the cuts on Kristen's hands were defensive wounds. Further, the State argued defendant lacked any defensive wounds. Defense counsel objected and requested a corrective instruction. The court declined to give a corrective instruction but directed the State to stay away from the defensive wounds. The court also stated, "The jury will be instructed that closing arguments are not evidence."

¶ 76 We find the State did not violate the order *in limine* when it refrained from eliciting any testimony that Kristen's wounds were defensive but argued, during closing argument, the defensive nature of Kristen's wounds. Importantly, we consider the tenor of the discussion between counsel and the trial court when addressing this issue during the hearing on the motion *in limine*. At that time, defense counsel indicated, "my bigger issue and concern is the unfair effect of having medical personnel saying without adequate foundation that certain wounds are self-inflicted, certain wounds of the victim are defensive. That would—that's expert testimony, and it's expert medical testimony. *** So the bottom line is that's expert testimony, and that type of expert testimony has not been disclosed by the People up to this point."

¶ 77 In response, the State specifically noted, "As far as paragraph 3, the defensive wounds, I believe we're going to have evidence of the wounds, where they're located. *** I believe the victim is going to say she put her arms up, she was trying—in a defensive posture, and that's where a lot—some of these wounds came from based upon her motions. So I believe that a jury can draw that, and I'm going to be arguing that at closing argument. It's just during the presentation of the evidence I don't know if there's going to be a person that absolutely says these are defensive wounds, these are not defensive wounds." In response, the court asked, "Do you anticipate any of your medical individuals to say based upon the nature of the wound that it was defensive in nature at this point?" In answering the court, the State indicated there existed at that time no individual who would offer such testimony.

¶ 78 When ruling on the motion, the court indicated "if the State does intend to use the word defensive, the court will need to go ahead and hear from that witness prior to that witness testifying." After hearing the court's remark, the State offered no such witness.

¶ 79 Well within the State's purview is the right to argue what the State believes the evidence shows and suggest to the jury how the jury should view the evidence. Here, in accordance with the order *in limine*, no State witness testified defendant's wounds were self-inflicted or that Kristen's wounds were defensive. Moreover, the trial court instructed the jury that closing arguments are not evidence. Therefore, we find the State's argument describing Kristen's wounds as "defensive" in nature appropriate and not prosecutorial misconduct.

¶ 80                                 4. *Cumulative Error*

¶ 81 Defendant argues that the cumulative effect of the prosecutorial misconduct by the State amounted to first-prong plain error. Given our analysis regarding the various statements made by the prosecution during cross-examination and closing argument, we are

unable to identify the "multiple" acts of misconduct that would be necessary to support a finding of cumulative error.

¶ 82　　　　In the alternative, defendant argues trial counsel rendered ineffective assistance by failing to preserve the prosecutorial misconduct issues on appeal.  To succeed on a claim of ineffective assistance of counsel, defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant.  *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255-56 (1984).  Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 83　　　　Here, because the State did not commit prosecutorial misconduct during cross-examination or closing argument, we decline to criticize counsel for failing to preserve any issue. Unable to show defense counsel's performance fell below an objective standard of reasonableness, defendant's ineffective assistance of counsel claim fails.

¶ 84　　　　　　　　　　　　B. Severance

¶ 85　　　　Defendant next argues his trial counsel provided ineffective assistance of counsel by failing to file a motion to sever the attempt murder charge (count I) and the aggravated assault charge (count VII) from the other counts.  Specifically, defendant argues his alleged prior offenses of domestic violence were not admissible as propensity evidence pursuant to section 115-7.4(a) of the Criminal Procedure Code (725 ILCS 5/115-7.4(a) (West 2014)), with regards to the attempt murder charge (count I) and the aggravated assault charge (count VII).  Defendant asserts the statute limits its applicability to "an offense of domestic violence" or "first degree murder or second degree murder when the commission of the offense involved domestic

- 23 -

violence[.]" Defendant contends trial counsel's failure to sever the attempt murder count (count I) and the aggravated assault charge (count VII) prejudiced defendant where the jury heard about defendant's prior domestic violence.

¶ 86    We review claims of ineffective assistance of counsel under the standard set forth in *Strickland.* To succeed on a claim of ineffective assistance of counsel, defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687.

¶ 87    Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *Simpson*, 2015 IL 116512, ¶ 35. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000). Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. *** The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1106 (2000).

¶ 88    Section 115-7.4(a) of the Criminal Procedure Code (725 ILCS 5/115-7.4(a) (West 2014)), involves evidence in domestic violence cases. Specifically, section 115-7.4(a) of the Criminal Procedure Code states:

"(a) In a criminal prosecution in which the defendant is accused of

an offense of domestic violence as defined in paragraphs (1) and

- 24 -

(3) of Section 103 of the Illinois Domestic Violence Act of 1986,

or first degree murder or second degree murder when the

commission of the offense involves domestic violence, evidence of

the defendant's commission of another offense or offenses of

domestic violence is admissible, and may be considered for its

bearing on any matter to which it is relevant." *Id.*

¶ 89 Section 103 of the Illinois Domestic Violence Act of 1986 (750 ILCS 60/103 (West 2014)), defines an offense of domestic violence as:

"(1) 'Abuse' means physical abuse, harassment, intimidation of a dependent,

interference with personal liberty or willful deprivation but does not include

reasonable direction of a minor child by a parent or person in loco parentis.

\*\*\*

(3) 'Domestic Violence' means abuse as defined in paragraph (1)." *Id.*

¶ 90 We look to the language of the statute to determine whether defendant's trial counsel erred by not severing the attempted murder charge (count I) and the aggravated assault charge (count VII) from the other counts. Section 115-7.4(a) allows evidence of defendant's commission of another offense of domestic violence where defendant is accused of "an offense of domestic violence" and "first degree murder or second degree murder when the commission of the offense involves domestic violence \*\*\*." 725 ILCS 5/115-7.4(a) (West 2014)).

¶ 91 Defendant argues the attempted murder charge (count I) and the aggravated assault charge (count VII) were not offenses of domestic violence or first degree murder or second degree murder involving domestic violence. While we agree the two counts did not involve first or second degree murder, we must determine what constitutes an offense of

domestic violence.  In doing so, we find *People v. Nixon*, 2016 IL App (2d) 130514, 53 N.E.3d 301, instructive.

¶ 92     *Nixon* involved a defendant charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a) (West 2012)) and being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2012)), for firing a weapon at a vehicle belonging to the mother of two of his children. *Nixon*, 2016 IL App (2d) 130514, ¶ 3.  The State sought to offer propensity evidence showing defendant previously shot the victim.  *Id.* ¶ 5.

¶ 93     After examining the charge, the evidence surrounding the offense, and the same statutory language involved in the case before us, the second district affirmed the trial court's determination defendant's alleged shooting at the victim's vehicle constituted an act of "domestic violence," allowing the State to present propensity evidence of a prior domestic violence incident.  *Id.* ¶ 45.

¶ 94     Based on language of the statute and the analysis in *Nixon*, we find defendant's attempted murder charge, where defendant attacked his then wife, involved an offense of domestic violence.  Thus, we find the State properly utilized propensity evidence in prosecuting the attempted murder charge.

¶ 95     We now turn to defendant's argument that where the aggravated assault charge did not involve "an offense of domestic violence," trial counsel provided ineffective assistance of counsel by failing to seek to sever the aggravated assault charge, and this allowed the jury to hear inadmissible propensity evidence.  We agree the aggravated assault charge in this case did not constitute an offense of domestic violence, meaning the State was not entitled to admit propensity evidence.  However, even so, we find defendant unable to establish prejudice.

¶ 96       Here, we consider whether improperly admitting propensity rendered the result of the trial on aggravated assault unreliable or the proceeding fundamentally unfair. *Simms*, 192 Ill. 2d at 363. In this instance, the propensity evidence paled in comparison to the evidence regarding the conduct with which defendant was charged. Even if the propensity evidence had not been admitted, the facts and circumstances regarding defendant's attack on Kristen would have been admitted in a separate trial on the aggravated assault charge. Moreover, the State's primary witness regarding the aggravated assault, Winston Whitten, provided compelling virtually unassailable testimony. Thus, even absent the propensity evidence, defendant still faced a credible witness whom defense counsel was unable to impeach. Although the propensity evidence was not admissible, the admission of the propensity evidence failed to render the results unreliable and did not make the proceeding fundamentally unfair. Given defendant's failure to demonstrate prejudice, his ineffective assistance of counsel claim fails.

¶ 97                                C. Jury Instructions

¶ 98       Defendant argues he was deprived of a fair trial where (1) his trial counsel failed to offer a necessity jury instruction on the aggravated assault charge (count VII) and (2) the trial court improperly instructed the jury on aggravated assault and trial counsel was ineffective for failing to object to the instruction given. The State argues a necessity instruction would have been properly rejected and the outcome of the proceedings would have been the same. Further, the State argues that even absent the "without justification" language, the aggravated assault jury instruction did not constitute reversible error. We agree with the State.

¶ 99                                1. *Necessity Instruction*

¶ 100      The State charged defendant with aggravated assault "in violation of 720 ILCS 5/12-2(c)(7) [(West 2014)], in that the said defendant knowingly, without authority, operated a

- 27 -

motor vehicle, a blue Dodge truck, in a manner which placed Winston Whitten in reasonable apprehension of being struck by said motor vehicle." Defendant argues he was entitled to a necessity defense where his wife slashed his throat, causing excessive bleeding, and he failed to stop for the work zone because he needed to obtain medical attention. Defendant asserts that a pattern instruction exists for such a defense—Illinois Pattern Jury Instructions, Criminal, No. 24-25.22 (approved July 18, 2014)—but that trial counsel failed to ask the trial court to instruct the jury on necessity.

¶ 101        We review claims of ineffective assistance of counsel under the standard set forth in *Strickland*. As stated above, to succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687.

¶ 102        Defendant argues that his testimony at trial established the basis for a necessity defense. The Illinois necessity statute provides,

> "Conduct which would otherwise be an offense is justifiable by
> reason of necessity if the accused was without blame in
> occasioning or developing the situation and reasonably believed
> such conduct was necessary to avoid a public or private injury
> greater than the injury which might reasonably result from his own
> conduct." 720 ILCS 5/7-13 (West 2014).

¶ 103        At trial, Whitten testified defendant drove fast through the construction zone. Whitten indicated defendant almost hit him and would have if he had not moved out of the way. In contrast, defendant testified he was not driving that fast when he went through the

- 28 -

construction zone.  Further, defendant testified he veered around the flag man and never intended to run over anyone.  Defendant testified it was his intention "[t]o get around [Whitten] and as safely as possible but get to the hospital."  In a nutshell, defendant asserted his driving was fine and he did nothing to place Whitten in reasonable apprehension of being struck by defendant's vehicle.

¶ 104    Based on the evidence presented at trial, we find a necessity defense inconsistent with defendant's theory of the case.  Defendant testified he did not nearly hit Whitten and instead veered around him.  A necessity instruction would have implicitly admitted to the jury that defendant did place Whitten in reasonable apprehension of being struck by his truck.  This case is analogous to *People v. White*, 2011 IL App (1st) 092852, ¶ 70, 963 N.E.2d 994, where the appellate court declined to find the defendant's trial counsel was ineffective for not arguing a self-defense theory of the case, where the defense would have been incompatible with the defense theory presented.

¶ 105    Like in *White*, we find trial counsel's performance did not fall below an objective standard of reasonableness when counsel avoided seeking an instruction inconsistent with defendant's version of events.  Thus, defendant's ineffective assistance claim fails.

¶ 106                              2. *Improper Jury Instruction*

¶ 107    Defendant argues the non-pattern instructions regarding aggravated assault (count VII) failed to accurately instruct the jury on the law, the trial court's failure to properly instruct the jury constituted plain error, and counsel provided ineffective assistance by failing to object to the non-patten instructions.

¶ 108    The State charged defendant with aggravated assault "in violation of 720 ILCS 5/12-2(c)(7) [(West 2014)], in that defendant knowingly, without authority, operated a motor

- 29 -

vehicle, a blue Dodge truck, in a manner which placed Winston Whitten in reasonable apprehension of being struck by said motor vehicle." The trial court instructed the jury that "A person commits the offense of aggravated assault when he operates a motor vehicle in a manner which places a person in reasonable apprehension of being struck by a moving motor vehicle."

¶ 109 Defendant argues the trial court improperly instructed the jury where the aggravated assault instruction omitted the language "without justification." Section 12-2(c)(7) of the Criminal Code of 2012 (720 ILCS 5/12-2(c)(7) (West 2014)), states a person commits aggravated assault when in committing an assault he, without justification, operates a motor vehicle in a manner which places a person in reasonable apprehension of being struck by the moving motor vehicle. Defendant argues omitting "without justification" constituted reversible error.

¶ 110 Initially, we note counsel agreed to the instruction given. Where counsel affirmatively agreed to the instruction given, the issue is waived and plain error analysis is not available. See *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12, 992 N.E.2d 184. Thus, we decline to engage in plain-error analysis on this issue.

¶ 111 In the alternative, defendant argues his trial counsel was ineffective for failing to object to the aggravated assault jury instructions. As stated above, to succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. Here, defendant is unable to establish prejudice.

¶ 112

¶ 113 Here, we find that defendant was not prejudiced where the jury instruction given omitted "without justification" language. In this case, the "correct" instruction would have

- 30 -

included the words "without justification." However, this was not an essential disputed issue. Instead, the dispute centered on whether defendant placed Whitten in reasonable apprehension of being hit by defendant's vehicle. Whether defendant was justified in undertaking the actions in which he engaged was not a disputed issue. Even absent the "without justification" language, the instructions given were sufficient to assist the jury in resolving the essential disputed issue. Also, as previously stated, any argument defendant was justified in his actions goes against defendant's theory of the case—that he carefully drove around Whitten and in no way placed Whitten in apprehension of being struck by defendant's vehicle. Therefore, defendant suffered no prejudice when the instruction given omitted "without justification" language. Thus, defendant's ineffective assistance of counsel claim fails.

¶ 114                                   III. CONCLUSION

¶ 115          For the reasons stated, we affirm the trial court's judgment.

¶ 116          Affirmed.